UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM F. MURRAY

                Plaintiff,

v.

CHURCH PENSION GROUP
SERVICES CORPORATION

                Defendant.

Case No. 21-cv-02228

---

**PLAINTIFF WILLIAM F. MURRAY'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

---

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ......................................................................................................1

COUNTERSTATEMENT OF FACTS .........................................................................................3

    1.  The malpractice complaint contained "numerous inaccuracies prejudicial to CIC" ...........3

    2.  Murray did not obtain approval from his superiors or the legal department to file the malpractice claim .........................................................................................................3

    3.  The Department of Financial Regulation's last report was favorable to CIC......................4

    4.  The Court may consider affidavits submitted to CPG in support of the motion ................4

LEGAL ARGUMENT...................................................................................................................4

    I.   The Public Policy Exemption to the At Will Rule..............................................................4

    A.  Statutes, Regulations and Case Law Establish that the Protection of the Liquidity and Solvency of Vermont-Domiciled Insurance Companies is a Compelling Public Policy of that State ......................................................................................................5

    B.  A So-Called Watchdog Employee does not enjoy fewer protections Under a State's Public Policy Because it is His Job to Supervise an Institution's Compliance with the Policy ..............................................................................................................10

    C.  Murray was Discharged for Engaging in Protected Activity...........................................13

CONCLUSION............................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Michigan Surety Co.,*
  364 Mich. 299 (1961) ............................................................................................ 9

*Ashcroft v. Iqbal,*
  556 U.S. 662  (2009)............................................................................................ 13

*Barker v. State Ins. Fund*,
  2001 OK 94, 40 P.3d 463....................................................................................7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 .................................................................................................... 14

*Benjamin v. Pipoly,*
  155 Ohio App.3d 171 (2003)............................................................................ 11

*Boynton v. ClearChoiceMD, MSO, LLC,*
  2019 VT 49 (2019)............................................................................................. 4

*Clinton v. State ex rel. Logan Election Bd.,*
  201 OK 52, 29 P.3d 543.................................................................................... 7

*Corcoran v. Frank B. Hall & Co.,*
  545 N.Y.S.2d 278 (1ˢᵗ Dep. 1989) .............................................................. 11,13

*Crain v. National American Insurance Company,*
  52 P.3d 1035 (Okla. Ct. App. 2002) ...................................................... 6, 10, 18

*Fonte v. Board of Managers of Continental Towers Condominium,*
  848 F.2d 24 (2d Cir. 1988)................................................................................. 3

*Foster v. Monsour Medical Foundation,*
  667 A.2d 18 (Pa. Commw. Ct. 1995) .............................................................. 11

*Gauthier v. Keurig Green Mountain, Inc.,*
  200 Vt. 125 (2015)........................................................................................... 17

*Holland v. Lovelace,*
  352 S.W.3d 777 (Ct. App Tx. 2011)................................................................ 11

*In re Ambassador Ins. Co.,*
  147 Vt. 344 (1986) .......................................................................................... 9, 11

*In re Liquidation of Ideal Mutual Insurance Co.,*
  532 N.Y.S.2d 371 (1st Dept. 1988) .................................................................. 11

*In re Western Insurance Co. v. Rottman,*
  2016 WL 7480361 (D. Utah 2016) ............................................................. 11, 13

*Israel v. Geithner,*
  2013 WL 4016929 *2 (E.D.N.Y. 2013)....................................................... 14, 17

*Jones v. Keogh*,
  137 Vt. 562 (1979).......................................................................................... 4, 10

*Jute v. Hamilton Sunstrand Corp.,*
  420 F.3d 166 (2d Cir. 2005)................................................................................ 19

*Kwan v. The Andaley Group LLC,*
  737 F.3d 834 (2d Cir. 2013)................................................................................ 16

*Lippman v. Ethicon*,
  222 N.J. 362 (2015) ............................................................................................ 10

*Long v. America Corp.,*
  2006 WL 547555 *2 (S.D.N.Y.  2006)................................................................ 19

*Lopresti v. Rutland Regional Health Services, Inc.,*
  177 Vt. 316 (2004) ................................................................................................ 4

*Myers v. Moody,*
  693 F.2d 1196 (5th Cir. 1982) ............................................................................ 12

*Neitzke v. Williams,*
  490 U.S. 319 (1989)............................................................................................ 14

*Oklahoma Benefit Life Ass'n v. Bird,*
  1943 OK 103, 135 P.2d 994.................................................................................. 7

*Payne v. Rozendaal,*
  147 Vt. 488 (1986).......................................................................................... 4, 10

*Pettersen v. Monaghan Safar Ducham PLLC*,
  2021 Vt. 16 (2021) ................................................................................................ 5

*Pittsburgh, Cincinnati, Chicago & St. Louis Railway v. Kinney*,
  95 Ohio St. 64 (1916) ............................................................................................. 4

*Robbins v. Old Tavern at Grafton, Inc.*,
  2005 WL 6154115 *4 (Vt. S. Ct. 2005) ................................................................ 15

*St. Mary's Honor Center v. Hicks*,
  509 U.S. 502 (1993) .......................................................................................... 16-17

*Swierkiewicz v. Surema*,
  534 U.S. 506 (2002) .............................................................................................. 14

**Statutes**

8 V.S.A. § 6001 ....................................................................................................... 8
8 V.S.A. § 7051(2) .................................................................................................. 8
8 V.S.A. § 7051(3) .................................................................................................. 9
8 V.S.A. § 7053(c) .............................................................................................. 9, 11
8 V.S.A. § 7055(a) and (c) ..................................................................................... 9
*N.J.S.A.* 34:19-3(a) ............................................................................................... 10

**Rules**

Fed. R. Civ. P. 26(5)(A)(ii) ...................................................................................3
Fed. R. Civ. P. 12(b)(6) ....................................................................................... 14
Fed. R. Evid. 801 (d)(2(D) ...................................................................................17

**Regulations**

Vt. Admin. Code § 4-3-52:16 ................................................................................ 8
Vt. Admin. Code § 4-3-52:4 .................................................................................. 7
Vt. Admin. Code § 4-6-1:2 .................................................................................... 8

**Other Authorities**

Christopher C. French, *Dual Regulation of Insurance,* 64 Vill. L. Rev 25, 33-35 (2019) ..............5

Samantha Daily, *Clever Titles and Insurance Don't Mix:  How Dodging Liability will Allow Insurance Companies to Become a Major Player in Climate Change Law and Policy Reform, Comment,* 7 San Diego J. Climate & Energy L.J. 141, 143 (2016).............................................. 12

Harvey C. Koch, Ashley L. Belleau & Patrick J. Collins, *Effecting Recovery and Subrogation in Specialized Situations,* 18 Fidelity L.J. 235 (2012) ................................................................. 12

John Patrick Hunt, *Rating Dependent Regulation of Insurance,* 17 Conn. Ins. L.J. 101, 104 (2010)................................................................................................................................................6

## PRELIMINARY STATEMENT

Defendant argues that the Complaint fails to identify a clear and compelling public policy that was violated by Plaintiff's discharge.

The clear and compelling public policy is the public's interest in the liquidity and financial stability of insurance companies.  The source of that policy is the regulatory scheme that treats insurance companies as quasi-public utilities, subject to state control for the benefit of the public. The Supreme Court of Vermont has held that this regulatory scheme is "designed to assure the people of this state in the first instance that their insurance companies shall be, and remain, not only solvent, but liquid. . . ."   There appears to be only one published decision from anywhere in the nation to consider the question presented here.  It holds that on laws almost identical to Vermont's, a wrongful discharge claim can be based on the violation of the "clear and compelling public policy goal of maintaining the financial integrity of an insurance company. . . ."

The regulatory scheme places a heavy burden on those who manage insurance companies to ensure that their institutions remain solvent.  If it becomes necessary to appoint a rehabilitator or liquidator, the rehabilitator or liquidator will have broad authority to sue any person, including the insurer's officers, managers or employees, to recover losses caused by "criminal or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer."  In that context, two attributes of insurer insolvency litigation become especially relevant to the public policy question in this case.

First, the financial condition of the insurance company is evaluated by Statutory Accounting Principles (SAP), not Generally Accepted Accounting Principles (GAAP) used in most other valuation contexts.  SAP is a much more conservative method specifically designed by the National Association of Insurance Commissioners (NAIC) to ensure insurer solvency.  Insurers

1

who appear to have net equity under the GAAP method will frequently be shown to be insolvent under the SAP method.   It is thus critically important that an insurance executive in Murray's position impose financial discipline and be aggressive in raising problems when and as necessary.

Second, courts from around the country have held that individuals sued in a liquidation or rehabilitation action have no defense based on prior disclosures to regulatory agencies.  In other words, even if the regulator knew about a specific risky practice and did nothing to stop it, the at-fault individual remains potentially liable.  The legal scheme therefore relies on and in fact compels "watchdog employees" such as Murray to enforce sound financial practices.

 Murray was fired after a series of contentious interactions with senior management over financial irregularities and poor management practices.  The stated reason for his termination was that he had created a toxic work environment at CIC and had failed to collaborate with the legal department before filing a legal malpractice action to recover an especially large loss.  Given the feathers he was forced to ruffle, it is understandable that people used to the old way of doing things would resent the imposition of controls and discipline and view the environment as toxic.  Moreover, it was his *duty* to try to recover the large loss.  The claim that he did not collaborate with the legal department in filing the lawsuit is simply false.  The relevant people were apprised of the case at every step along the way. CPG's General Counsel had a personal reason to want to withdraw the complaint and write-down the loss: her personal involvement in creating the loss.

The facts strongly suggest that Murray was fired for protecting the assets of CIC by people who were more interested in protecting their own interests and prerogatives.  There is no basis to dismiss the case prior to discovery and the motion must be denied.

## COUNTERSTATEMENT OF FACTS

Plaintiff relies on the facts pled in the Complaint filed under seal.  In order to remain compliant with the Court's redaction order, facts that have been redacted are described in a very general way, without revealing the information deemed privilege or otherwise protected, and only as necessary to make sensible arguments.   The model is Rule 26(5)(A)(ii). The following statements made by Defendant <u>are</u> <u>not</u> facts because they are not pled in the Complaint nor are they reasonably extrapolated from what is pled in the Complaint.  *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988) (Statements contained in a legal memorandum are not evidence and cannot be used to support a motion to dismiss).  It is respectfully requested that they be ignored.

### 1.   The malpractice complaint contained "numerous inaccuracies prejudicial to CIC."  [Moving Brief at 1, 4-5]

This allegation has never been asserted by Defendant before and it was not described as a reason for Murray's dismissal.

### 2.   Murray did not obtain approval from his superiors or the legal department to file the malpractice claim.  [Moving Brief at 1, 4]

Murray was the General Manager of CICVT – as Defendant concedes, he "was tasked with managing, overseeing, and implementing processes and procedures in an effort to make the [sic] CIC's financial operations more efficient and profitable, which included providing general oversight and accountability over CIC's operations and finances." [Moving Brief at 3]   As will be described in great detail *infra,* the filing of lawsuits is a substantial part of what insurance companies do. He did not need "permission" to file the malpractice complaint and again, it was not stated as a basis for discharging him.  The assertion was that he failed to "collaborate" with the legal department, which the Complaint shows to be false.

**3.   The Department of Financial Regulation's last report was favorable to CIC.  [p. 7, n. 3]**

This report is not referenced in the Complaint nor is it integral to the allegations made in the Complaint.

**4.   The Court may consider affidavits submitted by CPG in support of the motion. [p.2, n. 1]**

This statement is false and portends inappropriate submissions by way of reply.

## <u>LEGAL ARGUMENT</u>

## I.    THE PUBLIC POLICY EXCEPTION TO THE AT WILL RULE

"In Vermont, under an 'at will' employment contract, an employee may be discharged at any time with or without cause, 'unless there is a *clear and compelling* public policy against the reason advanced for the discharge." *Payne v. Rozendaal,* 147 Vt. 488, 491 (1986) (*quoting Jones v. Keogh*, 137 Vt. 562, 564 (1979)) (emphasis added).  "In substance, public policy may be said to be the community common sense and common conscience, extended and applied throughout the state to public morals, public health, public safety, public welfare and the like." *Payne,* 147 Vt. at 492 (*quoting Pittsburgh, Cincinnati, Chicago & St. Louis Railway v. Kinney,* 95 Ohio St. 64 (1916)).  "Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. . . . [i]t has frequently been said that such public policy, is a composite of constitutional provisions, statutes, and judicial decisions . . ." *Id.* at 493.

"An employee seeking to invoke the public-policy exception to at-will employment must demonstrate that [the] employer's conduct was 'cruel or shocking to the average person's conception of justice.'" *Boynton v. ClearChoiceMD, MSO, LLC*, 2019 VT 49 (2019) (*quoting Payne, supra,* at 493).  The "public policy restraints. . . are enforced to protect community norms for the benefit of the public at large, as well as the individual employee.  *Lopresti v. Rutland*

4

*Regional Health Services, Inc.,* 177 Vt. 316 (2004).   The public policy cause of action is not available to vindicate interests that are purely personal in nature and thus not in support of those concerning public morals, public safety, public welfare and the like.   *Pettersen v. Monaghan Safar Ducham PLLC,* 2021 Vt. 16 (2021).

Three questions are raised by this motion.   First, is the solvency and liquidity of an insurance company a clear and compelling public policy of the State of Vermont?   Second, does Murray, as General Manager of CIC, enjoy the protection of that public policy? And finally, assuming that the answer to the first two questions is "yes," is it plausible that Murray was fired for engaging in the protected activity?   Because the answer to all three questions is "yes," the motion to dismiss must be denied.

### A. Statutes, Regulations and Case Law Establish that the Protection of the Liquidity and Solvency of Vermont-Domiciled Insurance Companies is a Clear and Compelling Public Policy of that State

Defendant argues that protecting a company's solvency is an internal matter that does not implicate public policy concerns.   [Moving Brief at ¶ 7]   That may be true in most businesses - it is not true in the insurance industry.

Insurance companies play a unique role in the economy and are often referred to as quasi-public utilities.   *See generally,* Christopher C. French, *Dual Regulation of Insurance,* 64 Vill. L. Rev 25, 33-35 (2019).   They are the intermediaries in a system that distributes the risks of individuals and companies to larger groups or communities.   There is a delay, often a long delay, between when policies are sold, and claims must be paid.   Individuals and businesses face ruin if insurers cannot pay claims.[1]   Consequently, the industry is subject to stringent state regulation,

---

[1] Which is why, contrary to Defendant's argument on page 2 of the Moving Brief, the public policy identified by Plaintiff involves "public morals, public health, public safety, ***public welfare*** or the like." [emphasis added]

largely to ensure that companies remain solvent and liquid.   The problem was succinctly described

by Professor John Patrick Hunt:

> Solvency regulation as currently constituted includes several interlocking
> ideas. Insurers are required to file quarterly and annual reports on their
> financial condition to regulators, using specially prescribed accounting
> standards to do so.   Insurance regulators scrutinize these financial
> statements using special tools and confidential financial tests, and
> additionally conduct periodic on-site inspections of insurer's operations.
> Insurers are required to maintain reserves to pay claims and, in addition, are
> required to meet certain capital requirements intended to make sure that the
> insurer has a financial cushion against various misfortunes, such as greater-
> than-expected insurance losses and adverse interest rate moves.  Solvency
> regulation attempts to limit the negative effects of insolvency by requiring
> prompt regulatory action to close insolvent insurers before their problems
> deepen and by providing for state-level guarantee funds to compensate
> disappointed policyholders for at least a portion of their insolvency-related
> losses.

John Patrick Hunt, *Rating Dependent Regulation of Insurance,* 17 Conn. Ins. L.J. 101, 104 (2010).

Defendant argues that Plaintiff has failed to identify a harm sufficient to justify a claim that

he was terminated in violation of Vermont's public policy.   [Moving Brief at 7]   Solvency

regulation is premised on the idea that a mismanaged insurance company can find itself in trouble

very quickly to the extreme detriment of its policy holders.   The public policy at issue here is the

prevention of harm, not an assessment of the damage once the harm has occurred.

In *Crain v. National American Insurance Company,* 52 P.3d 1035 (Okla. Ct. App. 2002),

the plaintiff was an assistant vice president of an insurance company responsible for reporting the

status of estimated recoveries on claim files to his supervisor.  He was terminated, allegedly for

budgetary reasons, but claimed that the real reason was "his continued complaints to his

supervisors and others of the financial irregularity of the records of the company."  *Id.* at 1037.

Among the "others" he complained to was an outside auditor that the company hired to prepare

financial statements for filing with the Oklahoma State Insurance Department.  He asserted that

his discharge violated the public policy exception to the at-will rule.  *Id.* at 1038.  The defendant insurer filed a motion to dismiss for failure to state a claim.  The trial court granted the motion, Crain appealed and the Court of Civil Appeals of Oklahoma reversed.

The appeals court began its analysis by noting that under Oklahoma law, a "limited public policy exception" to the employment at will rule exists for "an employee who is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy."  *Ibid.* (*quoting Clinton v. State ex rel. Logan Election Bd.,* 201 OK 52, 29 P.3d 543, 548 (2001)).   The court noted that "[t]he Oklahoma Supreme Court considers the insurance industry to be a unique industry in that this industry, unlike ordinary business corporations, is highly regulated by the State. . . ."  *Id.* at 1039.  It therefore concluded that the plaintiff had identified a "specific, well-established, clear and compelling public policy":

> This Court, in accordance with *Barker* [*v. State Ins. Fund,* 2001 OK 94, 40 P.3d 463]   finds that Crain's reporting of what he asserts was false information upon which NAICO's outside  auditors may have based their annual reports of the company to the Insurance Commission is consistent with a clear and compelling public policy goal of maintaining the financial integrity of an insurance company so that it can fulfill its critical function of protecting the public.  The compelling nature of this policy is articulated by the specific statutes in Title 36 that closely regulate insurance companies. Because the insurance industry carries such an important  public mission, Oklahoma recognized the need to regulate the State's insurance companies by  constitutional  provisions  and  establishment  of  the  Insurance Commission to oversee the execution of the industry's state-related policy goals.  These  were recognized in the Supreme Court's clearly articulated decision in [*Oklahoma Benefit Life Ass'n v. Bird,* 1943 OK 103, 135 P.2d 994]  holding that insurance companies are a regulated industry under statutory control to protect the public.

*Id.* at 1041-42.

Vermont's insurance law is much the same.   Vt. Admin. Code § 4-3-52:4 provides that: "All insurers shall have an annual audit by an independent certified public accountant and shall file an

7

audited financial report with the commissioner [of Financial Regulation] on or before the year ended December 31 immediately preceding."  Vt. Admin. Code § 4-3-52:16 provides that: "A. No director or officer of an insurer shall, directly or indirectly:

> (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with any audit, review or communication required under this regulation; or

> (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading to an accountant in connection with any audit, review or communication required under this regulation.

As noted in Plaintiff's Complaint at ¶ 13, there is some lack of clarity on the question of whether CIC is a so-called captive insurance company, which are subject to somewhat different rules.  *See* 8 V.S.A. § 6001 *et seq.*  However, the reporting requirements for captives are largely the same.  *See* Captive Insurance Financial Regulation, Vt. Admin. Code § 4-6-1:2.

In addition to requiring annual reporting, Vermont law empowers the Commissioner of Financial Regulation to initiate legal proceedings to rehabilitate or liquidate an insurer if, among other things, (i) "[t]here is reasonable cause to believe that there has been embezzlement from the insurer, wrongful sequestration or diversion of the insurer's assets, forgery or fraud affecting the insurer, or other illegal conduct in, by, or with respect to the insurer that if established would endanger assets in an amount threatening the solvency of the insurer."  8 V.S.A. § 7051(2);  or (ii) "[t]he insurer has failed to remove any person who in fact has executive authority in the insurer, whether an officer, manager, general agent, employee, or other person; provided that the person has been found after notice and hearing by the Commissioner to be dishonest or untrustworthy in a way affecting the insurer's business," 8 V.S.A. § 7051(3).  Further, the Commissioner, as rehabilitator, may pursue legal action "[i]f it appears to the rehabilitator that there has been criminal

or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer by any officer, manager, agent, broker, employee, or other person[.]"  8 V.S.A. § 7053(c).  If the Commissioner believes an attempt to rehabilitate an insurer "would substantially increase the risk of loss to creditors, policyholders, or the public, or would be futile" he or she may petition for an order of liquidation."  The court also may permit directors of the insurer to petition the Court for an order terminating rehabilitation and allow for payment of fees. 8 V.S.A. § 7055(a) and (c).

In *In re Ambassador Ins. Co.,* 147 Vt. 344, 347-48 (1986), an insurance company in forced liquidation argued that the trial court had unfairly inflated the severity of its financial distress by failing to apply a present value adjustment to its future losses.  The Supreme Court of Vermont disagreed, noting that the trial court analyzed the insurer's financial condition by using the same accounting principles that insurers must use in their annual reports to the Commissioner of Insurance, referred to as "Statutory Accounting Principles" (SAP) and in "general and customary use in the United States" as established by the National Association of Insurance Commissioners.  Although that method might present a more dire picture of the insurer's predicament than would so-called "Generally Accepted Accounting Principles" (GAAP) used outside of the insurance context, the objective when analyzing the solvency of an insurance company is different.  The statute is not designed to establish an insurance company's commercially-reasonable valuation.  It is "designed to assure the people of this state in the first instance that their insurance companies shall be, and remain, not only solvent, but liquid. . . ." *Id.* at 347 (*quoting Adams v. Michigan Surety Co.,* 364 Mich. 299, 338 (1961)).

**B.     A So-Called Watchdog Employee does not Enjoy Fewer Protections Under a State's Public Policy Because it is His Job to Supervise an  Institution's Compliance with the Policy**

Defendant argues that because it was Murray's job to raise "pertinent operational and financial issues," as a matter of law, his having done so was not protected activity.  [Moving Brief at 9]  Support for that proposition is derived by Defendant from certain cases interpreting the New Jersey Conscientious Protection Act (CEPA), *N.J.S.A.* 34:19-3(a), which statute, in pertinent part, limits "whistleblowing" to objecting to or refusing to participate in practices that contravene public policy. The first point to make is that the Supreme Court of New Jersey has disavowed the interpretation of CEPA advanced by Defendant.  *Lippman v. Ethicon*, 222 N.J. 362, 383-85 (2015). In *Lippman,* the Court held that there is no statutory or principled basis to deny a whistleblower cause of action to a "watchdog employee" simply because it is that employee's duty to report illegal or unethical conduct.  The second point is that the Supreme Court of Vermont has never ruled that conduct protected by the public policy exception is limited to "whistleblowing," however that term might be defined. To the contrary, in *Payne v. Rozendeal* and other cases, the Supreme Court has described the protected conduct much more broadly, as conduct protected by a clear and compelling public policy. 147 Vt. at 588.  *See also Jones v. Keogh,* 137 Vt. 562, 564 (1979).  Nothing in the Vermont Supreme Court's opinions suggests that a public policy claim is limited to a retaliatory termination or any other particular type of discharge.  *Payne,* itself, was a discrimination claim, not a retaliation claim.

A significant fact relied on by the court in *Crain* was that the plaintiff faced legal jeopardy if he was aware of inaccurate financial information and failed to report it before it was utilized by

auditors to prepare financial statements.  *Crain, supra,* at 1041.  Murray also faced personal

liability.  Vermont's Supervision, Rehabilitation, and Liquidation of Insurer's Act, provides that

> [I]f it appears to the rehabilitator that there has been criminal or tortious
> conduct, or breach of any contractual or fiduciary obligation detrimental to
> the insurer by any officer, manager, agent, broker, employee, or other
> person, he or she may pursue all appropriate legal remedies on behalf of the
> insurer.

8 V.S.A. § 7053(c).

Under analogous provisions, liquidators and rehabilitators have sued corporate officers of

insurance companies across the country claiming that those officers caused losses through

mismanagement, negligence, breach of fiduciary duty and waste.  *See e.g., Corcoran v. Frank B.*

*Hall & Co.,* 545 N.Y.S.2d 278, 279 (1st Dept. 1989) (directors and officers treated insurance

company subsidiary as a "loss leader" for other businesses); *In re Liquidation of Ideal Mutual*

*Insurance Co.,* 532 N.Y.S.2d 371 (1st Dept. 1988) (directors and officers sued for breach of

fiduciary duty and mismanagement leading to insolvency); *Benjamin v. Pipoly,* 155 Ohio App.3d

171 (2003) (directors and officers breached fiduciary duties when they knew of serious problems

but took no steps to resolve them); *Holland v. Lovelace,* 352 S.W.3d 777 (Ct. App Tx. 2011)

(officers sued by liquidator for breach of fiduciary duty).  In such actions, courts have held that it

is not a defense to a claim for damages that the regulatory agency knew about the malfeasance but

failed to take corrective action. *See Foster v. Monsour Medical Foundation,* 667 A.2d 18, 21 (Pa.

Commw. Ct. 1995); *In re Western Insurance Co. v. Rottman,* 2016 WL 7480361 (D. Utah 2016).

That means that a corporate officer in Murray's position has a special obligation to monitor

aggressively his company's compliance with regulatory requirements and take whatever steps are

necessary to ensure that the institution remains on a sound financial footing.  It would be ludicrous

and counterproductive to deprive such an officer of the protections of the public policy he is

charged with enforcing.

That is especially true given the accounting method by which an insurer's assets are evaluated by state insurance regulators.  As noted in *In re Ambassador Ins. Co., supra,* at 347-48, such assets are evaluated by SAP rules, "even though [under GAAP rules,] assets may be shown to have substantially greater value and might show a net equity of the company." *Myers v. Moody,* 693 F.2d 1196, 1218 (5th Cir. 1982).  The point is to guarantee an insurance company's continuing solvency.  "This routine conservatism as reflected through the use of SAP requires only that certain types of assets be considered in calculating a company's financial condition, and that the 'value' of such 'admitted' assets be determined according to quite restrictive rules." *Ibid.*  Such "routine conservatism" must, therefore, become standard operating procedure for running an insurance company, particularly with regard to financial management.

Which includes, of course, making sure that the company collects whatever sums of money are owed to it.  An insurance company charges premiums and from those premiums and the investments made with them, it must pay claims.  To remain solvent, it must have an underwriting department that can accurately gauge risk and a claims department that can fairly resolve coverage questions by, among other things, denying claims that are not covered.  It must engage in hedging strategies by, among other things, purchasing re-insurance and seeking recovery of capital wherever it can, often through equitable mechanisms such as subrogation and the contractual right to insist that other insurers are fully or partially responsible for covering a particular loss.  Often it must recover losses through litigation. *See generally,* Samantha Daily, Comment, *Clever Titles and Insurance Don't Mix:  How Dodging Liability will Allow Insurance Companies to Become a Major Player in Climate Change Law and Policy Reform, Comment,* 7 San Diego J. Climate & Energy L. 141, 143 (2016) (describing the "[b]asics of how an insurance company works");

Harvey C. Koch, Ashley L. Belleau & Patrick J. Collins, *Effecting Recovery and Subrogation in Specialized Situations,* 18 Fidelity L.J. 235 (2012) (noting that "[f]or an insurer, issues of recovery after paying a claim are an important aspect of the claims process").

What it cannot do, especially when it is as small as CIC, is fail to attempt to recover a large, unhedged loss such as the one at issue in the malpractice case.  As the General Manager of CIC, it was Mr. Murray's job to attempt to recover that loss and it would arguably have been a breach of his fiduciary duty to the institution to fail to do so.  *See Corcoran v. Frank B. Hall, supra* (officers sued by liquidator because insurance company operated as if revenue did not matter); *In re Western Insurance Co. v. Rottman, supra* (officers of insurer sued by liquidator because they failed to make reinsurance claims on behalf of resulting in multi-million dollar loss to company).

## C.    Murray was Discharged for Engaging in Protected Activity

The factual question is whether it is plausible that Murray was fired for engaging in protected activity.   The protected activity was actions he took to protect CIC's liquidity and solvency, including the various complaints he made about financial irregularities and mismanagement and the filing of a malpractice case to recover a large loss.   The well-pled facts suggest that the real reason that Murray was fired was because the legal department wished to avoid being exposed as complicit in creating the malpractice liability and because senior management was fed up with Murray's interference in their business practices.   If protecting the liquidity and solvency of an insurance company is a clear and compelling public policy, it can be nothing other than a violation of that policy to fire an employee for those reasons.

To survive the motion to dismiss, Plaintiff must demonstrate that the claim is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."   It is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

> In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ibid.*   "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555

(2007) (*quoting Neitzke v. Williams,* 490 U.S. 319, 327 (1989)).   Because Rule 8(a)(2) only requires "a short plain statement of the claim showing that the pleader is entitled to relief," there is no requirement that the plaintiff plead facts sufficient to establish a prima facie case. *Swierkiewicz v. Surema,* 534 U.S. 506, 512 (2002).[2]   Although it is not necessary for the Plaintiff to establish the elements of a prima facie case of retaliation at the pleading stage, the "schema for analysis offers helpful insight concerning pleading plausibility."   *Israel v. Geithner,* 2013 WL 4016929 *2 (E.D.N.Y. 2013).

To support a claim of retaliatory discharge[3] in violation of public policy under Vermont law, plaintiff needs to show that: (1) he was engaged in an activity protected by public policy; (2) defendant knew of the protected activity; (3) defendant fired him; and (4) the sole or principal

---

[2] Although *Swierkiewicz* is a statutory discrimination case, there is no reason to conclude that it would not apply to a common law wrongful discharge case for which courts apply the so-called *McDonnell Douglas* test.  The holding of *Swierkiewicz* is based on the observation that Rule 8(a)'s simplified pleading standard applies to all civil actions.

[3] As noted *supra* at 5, public policy wrongful discharge claims are not limited in Vermont to claims of retaliation.  They can also include what might be termed discrimination for engaging in activity protected by the public policy.  *See Payne v. Rozendaal,* 147 Vt. at 491.

reason for his discharge was that he had engaged in the protected activity.  If the plaintiff establishes a prima facie case of retaliation, the employer must proffer a legitimate, nondiscriminatory reason for its actions. Plaintiff must then prove by a preponderance of the evidence that the employer's reasons for its actions are a pretext for discrimination. *Robbins v. Old Tavern at Grafton, Inc.,* 2005 WL 6154115 *4 (Vt. S. Ct. 2005).

Defendant describes Murray's allegations as "mundane workplace gripes" and "run of the mill bemoaning." [Moving Brief at 2, 8]  They are certainly not that.  The allegations regarding the behavior of certain executives of CPG are specific, disturbing, and suggest a history of poor management practices and tending to personal interests over the financial well-being and regulatory obligations of an insurance company.  Defendant also describes Murray's allegations as "speculative" and "riddled with inaccuracies and distorted subjective, perceptions."  [Moving Brief at 2]  Only discovery will reveal who is telling the truth and who is not.  Quite beyond Murray's own interests in the outcome of this litigation, there is a public policy benefit to having that question answered.

Accepting that the well-pled allegations of the Complaint are true, Murray was an excellent General Manager who, in a few short years, turned an underperforming, money-losing organization into a very high performing company. This claim is not based on conclusory statements devoid of factual enhancement. The Complaint provides the data to support the assertion:  how much was carried over in losses from prior years; how much was made in profit due to Murray's interventions.  [Complaint at ¶ 9]  In various places in Defendant's Brief, it takes exception to certain facts pled in the Complaint.  It has never disputed the Complaint's description of the company's dire circumstances before Murray's arrival or the magnitude of his success in turning things around.  That being so, it is not credible that he was fired for filing a malpractice

complaint to recover a large loss.  That is what insurance companies do – they file lawsuits to recover losses, large and small.  Assuming that the pleading had errors in it or there were other practical reasons to refrain from filing it, the simple solution was to dismiss the case or amend the pleading.  The stark overreaction in firing him suggests that much more was at issue than a poorly-conceived malpractice case.  At this point in the proceedings, Plaintiff is entitled to the inference that it was to relieve itself of an intrusive financial watchdog who filed a lawsuit to recover a loss that the General Counsel of the company wanted buried and forgotten.

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its actions."  *Kwan v. The Andaley Group LLC,* 737 F.3d 834, 846 (2d Cir. 2013).   It is simply implausible that such a successful insurance executive would be discharged for such a flimsy reason.

Also, the claim that Murray failed to collaborate with the legal department on the malpractice complaint is false.   As alleged in the Complaint, Murray worked closely with all relevant people at each step along the way.  [Complaint at ¶¶ 23, 24]  Of course, these executives deny that they were aware of the lawsuit.  But for purposes of this motion, it must be assumed that they are lying. *Iqbal, supra,* at 556 U.S. 678 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.")

Proof that the employer has lied about the reasons for firing an employee is one of the chief methods for establishing unlawful motive across the spectrum of discrimination, retaliation and unlawful discharge claims.  *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993) (noting that "the factfinder's disbelief of the reasons put forward by the defendant (particularly if

disbelief is accompanied by suspicion of mendacity) may, together with the elements of the prima

facie case, suffice to show discrimination"); *Gauthier v. Keurig Green Mountain, Inc.,* 200 Vt.

125, 138 (2015) (proof of pretext establishes motive in case based on termination for filing workers

compensation claim).

Evidence that the General Counsel had a personal reason to dismiss the malpractice case

and fire the person who authorized its filing is the statement described in paragraph 26 of the

Complaint.[4]  It is not a "smoking gun," in the sense that it does not directly attribute Murray's

dismissal to the improper motive, but a fair interpretation of it certainly makes the improper motive

more "probable than it would be without the evidence." Fed. R. Evid. 401(a).  Importantly,

because it was made by an employee on a matter within the scope of his employment, the statement

is not hearsay.  *See* Fed. R. Evid. 801(d)(2)(D).

In *Israel v. Geithner, supra,* the plaintiff claimed that proof that he was not promoted

because of his age was a particular statement attributed to the decisionmaker.  The defendant filed

a motion to dismiss, which the court described as turning on the fourth element of a prima facie

case: "has the plaintiff provided sufficient notice of circumstances likely to give rise to an inference

of discrimination?" *Id.* at 3. The court noted that the statement was susceptible to more than one

interpretation, one of which would suggest an age motive for failing to promote the plaintiff, one

of which would not.  Because the discriminatory interpretation was plausible and a motion to

dismiss "provides no platform to speculate as to what further discovery will reveal," the court

denied the motion.  *Id.* at 4.

The same is true of the statement described in paragraph 26 of the Complaint.  A

---

[4] Plaintiff would have much more to say about this particular statement, including an analysis of its wording and its status as protected by the attorney-client privilege, but that level of detail is foreclosed at the moment by the Court's redaction order.  Plaintiff made the arguments he deems relevant to the attorney-client privilege question in his letter brief in opposition to the motion to seal the record.

reasonable inference to be drawn from it provides evidence of the General Counsel's self-interested motivation in terminating Murray and dismissing the malpractice suit and a motion to dismiss "provides no platform to speculate as to what further discovery will reveal." *Ibid*.

Evidence that management was fed up with Murry's complaints is provided by the long history of complaints to senior management regarding financial irregularities and mismanagement. At least three of those complaints are functionally the same as the complaint at issue in *Crain v. National American Insurance Company*: complaints about financial irregularities that could affect the integrity of financial data supplied to state regulators. *Crain, supra,* at 1041.

In early 2017, Murray discovered that financial statements were showing that certain insurance policies were in force when in fact they had been canceled, resulting in overstated revenues. To correct the problem, he directed the head of the Billings and Collection unit to ensure that canceled insurance policies were canceled in the accounting system. This obviously irritated Mary Kay Wold, the President of Insurance Operations who signed the company's annual financial statement to the Commissioner of Financial Regulation, because she required Murray to call and apologize to an insured whose policy had been properly canceled. [Complaint at ¶ 14]

In the same year, Murray informed the company that CIC was issuing insurance in the British Virgin Islands (BVI) without a license. Obtaining such a license would require Mary Kay Wold to provide her personal financial records. Rather than do that, CIC simply dropped its BVI insurance business. [Complaint at ¶ 15] It is certainly plausible that Ms. Wold resented Murray's intrusion into a long-standing, albeit unlawful, practice that was earning the company revenue.

Also in 2017, Murray expressed concern to CPG senior management that CIC had failed to account adequately for the risk associated with a "swing-rated" umbrella reinsurance program, which had not been disclosed to the company's auditors and which, when it was, had the effect of

negatively impacting company's 2018 financials by a significant amount.  [Complaint at ¶ 16]  Again, it is easy to imagine how CPG management would resent the fact that because of Murray's intervention, it was forced to admit to an error that caused a material downward adjust to its financial statement.

In late 2019, Murray stopped the practice of using funds belonging to one insured to pay the obligations of another in violation of the company's contractual commitments.  [Complaint at ¶ 17]  Not long after that incident, he authorized the filling of the malpractice case.  [Complaint at ¶¶ 21-25]

It may be argued that the relevance of some of the reports of financial impropriety is diminished because they were reported years before Murray's discharge.  In retaliation and discrimination cases, incidents that bear on the question of motive may be relevant as "background evidence" even when substantially predating the adverse employment determination.  *Jute v. Hamilton Sunstrand Corp.,* 420 F.3d 166, 177-78 (2d Cir. 2005).  More importantly, the argument that such incidents are too remote in time to constitute evidence of causation are not determinative at the motion to dismiss stage, before a plaintiff has the opportunity to create a record during the discovery.  *Long v. America Corp.,* 2006 WL 547555 *2 (S.D.N.Y.  2006).

Of course, the malpractice case was not the only stated basis for Murray's termination.  Defendant also claimed that he had created a "toxic work environment."  A toxic work environment could imply many things.  But one very plausible interpretation is that CPG management resented Murray's efforts to enforce financial discipline and his complaints about financial irregularities.  Again, a motion to dismiss "provides no platform to speculate as to what further discovery will reveal."  The Court should deny the motion and allow the discovery process to go forward.

## **CONCLUSION**

For all of the above-referenced reasons, it is respectfully requested that the motion to dismiss be denied.

Respectfully submitted,


PASHMAN STEIN WALDER HAYDEN, P.C.

*/s/Samuel J. Samaro*
SAMUEL J. SAMARO
Pashman Stein Walder Hayden
Court Plaza South, Suite 200
Hackensack, NJ 07601
ssamaro@pashmanstein.com
Counsel for Plaintiff, William F. Murray

Dated:  July 1, 2021