```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/29/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

WILLIAM F. MURRAY,

                Plaintiff,

       -v-

CHURCH PENSION GROUP SERVICES
CORPORATION,

                Defendant.

---------------------------------------------------------------X

21-cv-2228 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

    Plaintiff William F. Murray ("Murray" or "Plaintiff") has sued his former employer, defendant Church Pension Group Services Corporation ("CPG" or "Defendant"), bringing one claim for retaliation in violation of public policy under Vermont law. Dkt. No. 2 ("Complaint" or "Compl."). Defendant moves to dismiss Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. Dkt. No. 8.

    For the following reasons, the motion to dismiss is granted.

## BACKGROUND

    For purposes of this motion, the Court accepts as true the well-pleaded allegations of the Complaint.[1]

---

[1] In its briefing on this motion, Defendant references facts not contained in the Complaint, and Plaintiff opposes the consideration of these additional facts. Dkt. No. 25 at 3–4. "In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (alteration adopted) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)). Accordingly, the Court does not consider Defendant's additional allegations on this motion.

CPG serves the Episcopal Church by providing pensions, retirement benefits, healthcare benefits, and other services to its clergy, lay workers, and institutions. Compl. ¶ 6. CPG's insurance business is comprised of a number of divisions or wholly owned entities, collectively referred to in the Complaint as Church Insurance Companies ("CIC"), which provide insurance policies to churches and particularly Episcopal churches. *Id.* ¶ 7. CPG oversees CIC's operations and is intricately involved in CIC's hiring decisions. *Id.*

Murray is a Vermont resident and was employed by CPG as CIC's Senior Vice President and General Manager from September 6, 2016 through May 12, 2020, when he was terminated. *Id.* ¶ 8. Prior to Murray's arrival, CIC was poorly run and mismanaged and had been losing money for many years. *Id.* ¶ 9. For example, Murray had to explain why the policy administration system needed to be updated to reflect when policies had been canceled, why policies could not be thrown out, why financial records had to be scrupulously maintained, and why funds held in trust on behalf of one insured could not be comingled with funds belonging to another. *Id.* ¶ 11. Murray introduced processes and procedures and worked to prevent or correct financial irregularities and mismanagement. *Id.* ¶¶ 10, 12. Murray alleges that, during his tenure, CIC went from being one of the worst insurance companies in the United States to the best by the most important metrics. *Id.* ¶ 9.

Murray alleges that, during his tenure, he witnessed poor management of CPG and CIC operations including several instances involving CPG/CIC's legal department.

For example, in or around early 2017, Murray conducted an initial review of the Billing and Collection operation processes and found that canceled insurance policies were being misrepresented in financial statements to show that they had not been canceled. *Id.* ¶ 14. Murray directed the Billing and Collection Department to ensure that any canceled policy be

canceled in the accounting system. *Id.* Once this change took place, an insured whose policy was properly canceled complained about the cancellation to the President of Insurance Operations who then directed Murray to apologize to the insured. *Id.*

In another instance, Murray discovered that CPG/CIC was selling insurance in the British Virgin Islands without a license and raised the issue with the CPG ▮▮▮▮. *Id.* ¶ 15. Murray alleges that a license could have been obtained if CIC's President and Chief Executive Officer Mary Katheryn Wold ("Wold") released her personal financial records. *Id.* Instead, however, the company dropped its insurance business in the British Virgin Islands and canceled all of its insurance policies there. *Id.*

In addition, in or about 2017, Murray expressed concern to CPG's Chief Operating Officer and Chief Financial Officer over how the company had optimistically projected no losses on a reinsurance program that Murray said had a potential liability of ▮▮▮▮. *Id.* ¶ 16. Murray explained that the projection was a mistake that should be corrected. *Id.* The company's accountant was not made aware of the liability and did not account for it, and the company's 2018 financials were negatively affected by ▮▮▮▮ as part of the ▮▮▮▮ potential liability that Murray had projected. *Id.*

Additionally, when conducting an audit sometime in 2019, the Deputy Commissioner of the Vermont Department of Financial Regulation asked Murray why one of CIC's umbrella companies—the Church Insurance Company of Vermont ("CICVT")—was formed as a pure captive insurer.[2] *Id.* ¶ 13. Murray informed CPG's ▮▮▮▮

---

[2] A pure captive insurer is an insurance company that insures the risks of its parent or affiliated companies. *See id.* ¶ 13.

▓▓▓▓▓▓ that CICVT's status as a pure captive insurer was wrongful. *Id.* To Murray's knowledge, nothing was ever done in response to his disclosure to ▓▓▓▓▓ *Id.*

In late 2019, the Billings and Collections Department requested that Murray authorize a payment of about ▓▓▓▓▓ to Liberty Mutual Insurance Company, using CIC funds, on behalf of the United Methodist Insurance Program ("UMI"), which was managed by CIC. *Id.* ¶ 17. Murray informed both the accounting department and the Billing and Collections Department that it was improper to use Episcopal funds to satisfy United Methodist obligations. *Id.* The contract between Liberty Mutual and CIC confirmed Murray's understanding that only Episcopal funds held in trust could be used for Episcopal obligations and that CIC funds could not be used to pay UMI obligations. *Id.* According to Murray, CIC was fronting premiums in support of another group's insurance program in violation of its fiduciary obligations to its Episcopal Church stakeholders. *Id.*

Murray also witnessed an attempt to fire CIC's Operations Manager for instructing an employee that the company needed to give an insured notice to cancel an insurance policy. *Id.* ¶ 18. Murray intervened, and, because of his intervention, the employee was not terminated. *Id.*

Murray was also involved in several matters stemming from a lawsuit that preceded his employment with CPG and CIC. Around 2012, a lawsuit arose from the separation of the Episcopal Diocese of South Carolina from the Episcopal Church. *Id.* ¶ 20. CPG's Chief Legal Officer Sanborn hired an attorney in South Carolina (the "South Carolina Attorney") to represent CPG even though senior members of CIC believed the South Carolina Attorney to be unqualified. *Id.* The case ultimately settled with CPG paying ▓▓▓▓▓▓▓. *Id.* But the South Carolina Attorney and the CPG legal department did not adequately prepare the release agreements after the litigation settled in 2012. *Id.* ¶ 21. When CPG received a second demand

4

for damages from the South Carolina church in 2018, CPG sustained an additional ███████ in liability because the 2012 releases were improperly drafted and reviewed. *Id.*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ A malpractice complaint was filed against the South Carolina Attorney in or about February 2020. *Id.*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

5



▇▇▇   *Id.*

Four days after Murray's conversation with Armstrong, Murray was terminated for "lack of collaboration with the CPG legal department" and "creating a toxic environment at CPG/CIC." *Id.* ¶ 28. Murray alleges that CPG/CIC senior executives "were fed up with [his] constant effort[s] to impose financial controls and best insurance practices," *id.*, and that he was terminated "for bringing to light the incompetence and financial mismanagement of CPG/CIC's senior management team, and in particular its General Counsel, Nancy Sanborn, whose failure to supervise the execution of release agreements in 2012 created a ▇▇▇ liability for the company, a liability that would have been exposed if the malpractice action against the South Carolina Attorney continued," *id.* ¶ 30. Murray alleges he was terminated because he opposed the mismanagement that threatened the insurance company's assets. *Id.* ¶ 40.

## PROCEDURAL HISTORY

Plaintiff was granted leave to file a case under seal on March 3, 2021. *See ABC v. DEF*, 21-mc-209 (S.D.N.Y.), ECF Nos. 1, 3. The Complaint was entered on the docket for this case on March 15, 2021. Dkt. No. 2. The Complaint brings one claim for retaliation in violation of public policy under Vermont common law. *Id.* ¶¶ 31–42. It asserts that Vermont "has a strong public policy of ensuring that insurance companies remain solvent and liquid for the benefit of the policy holders and the public at large." *Id.* ¶ 39. Defendant moved to dismiss the Complaint

on May 18, 2021. Dkt. No. 8. At the initial pretrial conference held on June 25, 2021 by telephone, the Court stayed discovery. Plaintiff filed his brief in opposition to the motion to dismiss on July 1, 2021. Dkt. No. 25; *see also* Dkt. No. 26. Defendant filed its reply brief in support of the motion to dismiss on July 29, 2021. Dkt. No. 35.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendant primarily argues that Plaintiff fails to state a claim for retaliation in violation of public policy because Plaintiff cannot articulate a clear and compelling public policy that he was retaliated against for protecting and thereby cannot establish that he engaged in any

7

protected activity.  Dkt. No. 8 at 1–2.  According to Defendant, Plaintiff's alleged efforts to protect CIC's solvency in the course of performing his job responsibilities are insufficient to state a claim for retaliation in violation of public policy.  *Id.*  If they were, any employee would be able to bring a retaliation claim alleging violation of public policy merely by claiming that they were acting for their employer's financial benefit.  *Id.* at 2.

Plaintiff responds by arguing that the clear and compelling public policy at issue is the public's interest in the liquidity, solvency, and financial stability of insurance companies.  Dkt. No. 25 at 1.  Plaintiff contends that this public policy arises from the regulatory scheme that treats insurance companies as quasi-public utilities and places a heavy burden on those who manage insurance companies to ensure that their institutions remain solvent.  *Id.*  Plaintiff argues that he engaged in activity protected by public policy by making various complaints about financial irregularities and mismanagement and by the filing of a malpractice case to recover a large loss.  *Id.* at 13.  He argues that he was fired "because the legal department wished to avoid being exposed as complicit in creating the malpractice liability and because senior management was fed up with [his] interference in their business practices."  *Id.*

"Under Vermont law, an at-will employee may be discharged at any time with or without cause, 'unless there is a *clear and compelling* public policy against the reason advanced for the discharge.'"[3]  *Neviaser v. Mazel Tec, Inc.*, 2012 WL 3028464, at *3 (D. Vt. July 25, 2012) (quoting *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 397 (Vt. 2002)).  As a result, "[a]n at-will employee may maintain a separate, independent claim for wrongful discharge in violation of public policy."  *Id.* (citing *Dulude*, 807 A.2d at 397).  To support a claim of retaliatory discharge in violation of public policy, a plaintiff must show that: "(1) []he was

---

[3] The parties agree that Vermont law applies.  *See* Dkt. No. 8 at 6; Dkt. No. 25 at 4.

8

engaged in an activity protected by public policy; (2) defendant knew of the protected activity; (3) defendant fired [him]; and (4) the sole or principal reason for [his] discharge was that []he had engaged in the protected activity." *Robbins v. Old Tavern at Grafton, Inc.*, 2005 WL 6154115, at *4 (Vt. 2005); *see also Adams v. Green Mountain R.R. Co.*, 862 A.2d 233, 236 (Vt. 2004). "If a plaintiff establishes a prima facie case of retaliation, the employer must proffer a legitimate nondiscriminatory reason for its actions." *Robbins*, 2005 WL 6154115, at *4. "Plaintiff must then prove by a preponderance of the evidence that the employer's reasons for its actions are a pretext . . . ." *Id.*

To establish that a plaintiff engaged in protected activity for purposes of a prima facie case, a plaintiff must show that the alleged reason for his termination violates public policy. *See Mayhew v. Hermitage Club, LLC*, 2016 WL 6997490, at *3 (D. Vt. Nov. 30, 2016). "The Vermont Supreme Court has defined public policy as 'the community commonsense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like,' and 'when an employer's course of conduct with regard to an at-will employee is cruel or shocking to the average person's conception of justice, such conduct must be considered contrary to public policy even if the policy is not explicitly set forth in our written laws.'" *Neviaser*, 2012 WL 3028464, at *3 (quoting *Adams*, 862 A.2d at 235). "In looking to the public policy of the state, a court is not limited to legislative pronouncement or judicial decisions." *Marcoux-Norton v. Kmart Corp.*, 907 F. Supp. 766, 771 (D. Vt. 1993). Rather, "[p]ublic policy may be said to abide 'in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right.'" *Id.* (quoting *Payne v. Rozendaal*, 520 A.2d 586, 588 (Vt. 1986)); *see also Mayhew*, 2016 WL 6997490, at *3 ("Sometimes such public policy is

9

declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people . . . ." (alteration adopted)). But "where 'redress is sought for private concerns,' such as asserting one's right to vacation and sick leave or a refusing to sign a non-compete agreement," the Vermont Supreme Court "has found no wrongful discharge claim." *Mayhew*, 2016 WL 6997490, at *3 (alteration adopted) (quoting *Payne*, 520 A.2d at 589). "Furthermore, an employee cannot bring a wrongful discharge claim for a termination arising from a mere difference of professional judgment." *Id.* (citing *Dulude*, 807 A.2d at 397).

Here, Plaintiff asserts that he was terminated for protecting the assets of CIC. Dkt. No. 25 at 2. Plaintiff argues that an insurance company's solvency implicates public policy concerns because "[i]nsurance companies play a unique role in the economy and are often referred to as quasi-public utilities" and that state "[s]olvency regulation is premised on the idea that a mismanaged insurance company can find itself in trouble very quickly to the extreme detriment of its policy holders." *Id.* at 5–6. In arguing that public policy is implicated, Plaintiff highlights several Vermont regulations and laws governing insurance companies. Plaintiff notes that Vermont regulations require annual audits of insurance companies and prohibit insurance company directors and officers from making materially false or misleading statements or from omitting material facts in relation to these audits. *See id.* at 7–8 (citing 4-3 Vt. Code R. §§ 52:4, 52:16). Plaintiff also discusses how Vermont law authorizes the state's Commissioner of Financial Regulation to initiate legal proceedings to rehabilitate or liquidate an insurer if, among other things: (1) "[t]here is reasonable cause to believe that there has been embezzlement from the insurer, wrongful sequestration or diversion of the insurer's assets, forgery or fraud affecting the insurer, or other illegal conduct in, by, or with respect to the insurer that if established would

endanger assets in an amount threatening the solvency of the insurer," Vt. Stat. Ann. tit. 8, § 7051(2); or (2) "[t]he insurer has failed to remove any person who in fact has executive authority in the insurer, whether an officer, manager, general agent, employee, or other person; provided that the person has been found after notice and hearing by the Commissioner to be dishonest or untrustworthy in a way affecting the insurer's business," *id.* § 7051(3). Plaintiff also observes that the Commissioner may pursue legal action "[i]f it appears to the rehabilitator that there has been criminal or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer by any officer, manager, agent, broker, employee, or other person." *Id.* § 7053(c). Plaintiff further notes that, if the Commissioner believes an attempt to rehabilitate an insurer "would substantially increase the risk of loss to creditors, policyholders, or the public, or would be futile," the Commissioner may petition the courts for an order of liquidation, *id.* § 7055(a), and that the directors of an insurer may petition the courts for an order terminating rehabilitation and allow for payment of fees, *id.* § 7055(c). In addition to these statutes, Plaintiff cites *In re Ambassador Ins. Co., Inc.*, in which the Vermont Supreme Court described a statute regarding insurance company annual reports as "designed to assure the people of this state in the first instance that their insurance companies shall be, and remain, not only solvent, but liquid." 515 A.2d 1074, 1077 (Vt. 1986) (quoting *Adams v. Michigan Surety Co.*, 110 N.W.2d 677, 697 (Mich. 1961)).

Plaintiff's claim fails because Plaintiff has not pleaded facts sufficient to show that he engaged in activity protected by the Vermont public policy he says he was furthering. The Court assumes without deciding that there is a clear and compelling public policy in Vermont of ensuring that insurance companies remain solvent—as Plaintiff argues.[4] Nevertheless, measured

---

[4] Though the Court need not decide this issue, the Court notes that Plaintiff cites to no Vermont

11

against this policy of protecting the solvency of insurance companies, Plaintiff fails to explain how the incidents described in the Complaint rise to the level of actions in furtherance of that policy.  Plaintiff, for example, has not pleaded facts to support why his actions to ensure that canceled insurance policies were also canceled in the accounting system are acts protected by public policy.  For instance, there are no allegations of fact to support that the company made materially false or misleading statements in relation to the annual audits required by the state prior to Plaintiff's alleged intervention or that, as a result of that intervention, the financial statements ceased being materially false or misleading, *see* 4-3 Vt. Code R. §§ 52:4, 52:16; there also are no allegations of fact that by not canceling the insurance policies at issue Defendant engaged in "criminal or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer," Vt. Stat. Ann. tit. 8, § 7053(c).  For the same reasons, Plaintiff has not shown why his actions to prevent the termination of another employee for giving instructions on notifying insured of canceled policies is significant with respect to Vermont public policy.

       The same problems plague the other incidents of which Plaintiff complains.  Plaintiff, for example, alleges that the company took a more optimistic position on one of the company's potential liabilities than it should have in Plaintiff's view and, as a result, the company's 2018

---

case law recognizing this particular public policy exception to the general doctrine that an at-will employee may be discharged at any time with or without cause. Moreover, even if Plaintiff's employer is assumed to have terminated Plaintiff for protecting the insurance company's assets, this conduct is not so "cruel or shocking to the average person's conception of justice" that "such conduct must be considered contrary to public policy." *Neviaser*, 2012 WL 3028464, at *3. Rather, this conduct would appear more akin to "a termination arising from a mere difference of professional judgment," which the Vermont Supreme Court has found not to be the basis for a wrongful discharge claim in violation of public policy. *Id.* (citing *Dulude*, 807 A.2d at 397). As the Vermont Supreme Court has noted, "[w]hile full employment and employer-employee harmony are noble goals to which society aspires, they alone do not present the clear and compelling public policies upon which courts have been willing to rely in upholding an action for discharge of an employee at will." *Id.* at *4 (quoting *Jones v. Keogh*, 409 A.2d 581, 582 (Vt. 1979)).

financials were negatively affected. But Plaintiff does not allege that the company's position was in violation of the relevant accounting standards or that it resulted in the company making materially false or misleading statements in its final statements; that the company's conduct amounted to criminal or tortious conduct or breach of any contractual or fiduciary obligation; or that the company's solvency was jeopardized.

Similarly, Plaintiff does not allege facts to show why the purported mistake in forming CICVT as a pure captive insurer and his efforts to inform CPG's ▮▮▮▮ about the mistake furthers Vermont public policy regarding the solvency of insurance companies. Likewise, Plaintiff alleges that he advised the company that it was selling insurance in the British Virgin Islands without a license, but Plaintiff has not shown why such action relates to the solvency of the company.

Plaintiff's allegations regarding the malpractice lawsuit suffer from the same defects. Plaintiff alleges that a malpractice lawsuit was filed against the South Carolina Attorney who had worked on a case that ultimately settled with CPG paying ▮▮▮▮ and that later led to an additional ▮▮▮▮ liability. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As a threshold matter, Plaintiff has not alleged how exactly he was involved in the malpractice lawsuit, and, therefore, it is difficult to assess how Plaintiff may or may not have engaged in protected activity with respect to the lawsuit. However, assuming that Plaintiff was involved in the lawsuit, Plaintiff again has failed to allege facts regarding how his involvement in the lawsuit or the lawsuit itself relates to the solvency of the insurance company or involves an amount that threatens the solvency of the insurance company. Though

he alleges that the ▓▓▓▓ loss had a "direct negative impact on CPG/CIC's 2018 profits," Compl. ¶ 22, he does not connect this loss to the solvency of CPG/CIC.

Plaintiff also complains that CIC improperly used Episcopal funds to fund United Methodist obligations, asserting in his memorandum of law that this was a violation of its fiduciary obligations.  But Plaintiff offers mere conclusions to support that there was a breach of a fiduciary obligation and fails to allege facts to show how such breach was detrimental to the insurer.  *See* Vt. Stat. Ann. tit. 8, § 7053(c).  Plaintiff has further failed to plead facts that such conduct by CIC is akin to "embezzlement from the insurer, wrongful sequestration or diversion of the insurer's assets, forgery or fraud affecting the insurer, or other illegal conduct in, by, or with respect to the insurer *that if established would endanger assets in an amount threatening the solvency of the insurer*."  *Id.* § 7051(2) (emphasis added).  Even if Plaintiff had pleaded that there was some act of wrongful sequestration or diversion of assets, Plaintiff has not pleaded that the ▓▓▓▓ payment at issue "would endanger assets in an amount threatening the solvency of the insurer."  *Id.*  Vermont law specifically focuses on the conduct to the extent that it affects the public policy asserted to be at issue—here, the solvency of the insurer.  For Plaintiff's actions to be protected by the public policy exception to the at-will employment doctrine, Plaintiff must show that his conduct fits within the bounds of the asserted policy objective.  As to each of these incidents, it is possible that Plaintiff may be able to supplement his allegations with facts to connect them with the specific public policy he advanced under Vermont law, but the Complaint, as pleaded, fails to do so.

The crux of the issue is that an at-will employee's ability to maintain a claim for wrongful discharge in violation of public policy is a narrow exception to the at-will employment doctrine in Vermont.  It cannot be that any action by an employee in the insurance industry that

is in service of an insurance company's bottom line is protected by Vermont public policy. If it were so, the public policy exception would no longer serve as an exception and instead preclude the termination of employees in the insurance industry—or perhaps any industry regulated by the state in like manner—if the employees act to their employers' benefits. It is true that Plaintiff himself conceives of Vermont public policy to extend specifically to solvency—and the Court has assumed without deciding that such a clear and compelling policy exists. But Plaintiff has not alleged enough to show that his actions fall within this exception.

The Court of Civil Appeals of Oklahoma case *Crain v. National American Insurance Company*, 52 P.3d 1035 (Okla. Civ. App. 2002), cited by Plaintiff, highlights the deficiencies in Plaintiff's pleading. In *Crain*, the court found that the allegations of the plaintiff, Ron Crain ("Crain"), about his former insurance company employers (collectively referred to as "NAICO") and his reporting of the insurance company's conduct "f[ell] within the limited and tightly circumscribed public policy exception to the at-will employment doctrine." *Id.* at 1037. Crain allegedly reported purported inaccuracies of the estimated recoveries on claims to the outside auditing company hired by NAICO. *Id.* at 1039. Inaccuracies in estimated recoveries on claims could adversely affect an insurance company's financial status and had direct bearing on the monetary amounts an insurance company must maintain in reserve as prescribed by state statute. *Id.* at 1039–40. Further, the outside auditing company to which Crain reported the inaccuracies were conducting an auditing process required by statute. *Id.* at 1040. The court held that "Crain's reporting of what he asserts was false information upon which NAICO's outside auditors may have based their annual reports of the company to the Insurance Commission is consistent with a clear and compelling public policy goal of maintaining the financial integrity of

an insurance company so it can fulfill its critical function of protecting the public." *Id.* at 1041–42.

*Crain* is unlike the case at hand in a few respects.[5] Most importantly, Crain, unlike Plaintiff here, directly tied his conduct to the state's public policy regarding insurance company regulation. Crain specifically and closely linked his reporting of financial irregularities to state required audits. Plaintiff, however, does not make such direct allegations and instead alleges conduct far attenuated from any Vermont state law, regulation, or public policy. As discussed above, Plaintiff fails to allege facts connecting any of the incidents described in his Complaint to, for example, materially false or misleading statements in relation to state required audits, *see* 4-3 Vt. Code R. §§ 52:4, 52:16; embezzlement, wrongful sequestration or diversion of assets, forgery or fraud, or other illegal conduct "that if established would endanger assets in an amount threatening the solvency of the insurer," Vt. Stat. Ann. tit. 8, § 7051(2); "criminal or tortious conduct, or breach of any contractual or fiduciary obligation detrimental to the insurer," *id.* § 7053(c); or the direct solvency of CPG/CIC. Without such facts, even assuming there existed a clear and compelling Vermont public policy of ensuring that insurance companies remain solvent, Plaintiff cannot state a claim for relief.

In sum, because Plaintiff fails to allege that he engaged in activity protected by Vermont public policy, Plaintiff fails to state a claim for retaliation in violation of public policy under Vermont law.

---

[5] Though *Crain* held that there existed "a specific, well-established, clear and compelling public policy defined by the Oklahoma law regulating the insurance industry," *id.* at 1042, Plaintiff has cited no cases from Vermont courts holding the same.

## CONCLUSION

The motion to dismiss is GRANTED, and the Complaint is DISMISSED without prejudice. If Plaintiff does not file an amended complaint within 30 days of the date of this Order, the case will be closed.

SO ORDERED.

Dated: April 29, 2022  
      New York, New York

                                                LEWIS J. LIMAN  
                                         United States District Judge